**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| CHARTER COMMUNICATIONS, INC., | ) | |
| WIDEOPENWEST FINANCE LLC a/k/a | ) | |
| WOW! INTERNET, CABLE & PHONE, | ) | |
| KNOLOGY, INC., | ) | |
| CEQUEL COMMUNICATIONS, LLC, d/b/a | ) | |
| SUDDENLINK COMMUNICATIONS, | ) | |
| and CABLE ONE, INC., | ) | |
| | ) | |
| | ) | Civil Action No._____ |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **DEMAND FOR JURY TRIAL** |
| | ) | |
| ROCKSTAR CONSORTIUM US LP, | ) | |
| BOCKSTAR TECHNOLOGIES LLC, | ) | |
| CONSTELLATION TECHNOLOGIES LLC, | ) | |
| and SPHERIX INCORPORATED, | ) | |
| | ) | |
| Defendants. | ) | |

**COMPLAINT**

Plaintiffs, Charter Communications, Inc., ("Charter"), WideOpenWest Finance, LLC a/k/a WOW! Internet, Cable & Phone ("WideOpenWest"), Knology, Inc. ("Knology" and, together with WideOpenWest, "WOW"), Cequel Communications, LLC d/b/a Suddenlink Communications ("Suddenlink"), and Cable One, Inc. ("Cable One") (collectively "Plaintiffs") allege as follows for their Complaint against Rockstar Consortium US LP ("Rockstar"), Bockstar Technologies LLC ("Bockstar"), Constellation Technologies LLC ("Constellation") and Spherix Incorporated ("Spherix") (collectively "Defendants"):

**Nature of the Action**

1.     Rockstar is a patent assertion entity whose business includes the assertion of patents it acquires from third parties.  Rockstar claims to own and/or control over 4,000 patents, virtually all of which, upon information and belief, Rockstar acquired from the

bankruptcy estate created when Nortel Networks Corporation, Nortel Networks Inc., and various of their subsidiaries (collectively, "Nortel") filed for bankruptcy protection in Canada and the United States in 2009.

2.      Through a campaign to enforce this recently-acquired portfolio, Rockstar has accused Plaintiffs—which are in the communications, cable and/or wireline industries—of infringing large swaths of the portfolio, based on Plaintiffs' adoption of various communication and networking technologies related to those industries.

3.      Through Bockstar and Constellation, Rockstar has also initiated litigation against members of the communications, cable and/or wireline industries to enforce various communications technology patents within the portfolio.

4.      These public allegations of infringement, threats of litigation, and lawsuits by Rockstar, for itself and on behalf of Bockstar, Constellation, and Spherix, have cast a cloud of uncertainty over Plaintiffs' businesses requiring the declaratory relief sought in this Complaint.

5.      Rockstar contends that it is able to levy these allegations against Plaintiffs because many of the patents obtained from Nortel are patents that allegedly apply to well-established, technical standards that have become ubiquitous in the communications industry.

6.      In many instances such technical standards are designed into the equipment Plaintiffs purchase from vendors, and must be implemented to interoperate with other communications providers and their end user customers.

7.      Notwithstanding Rockstar's threats to enforce these patents, Rockstar, and on information and belief, Bockstar, Constellation, and Spherix, are under an obligation to license the patents in this portfolio that are essential to these standards on fair, reasonable and non-discriminatory ("FRAND" or "RAND") terms.

8. Rockstar, for itself and on behalf of Bockstar, Constellation, and Spherix, has nevertheless refused to enter into negotiations with Plaintiffs or their vendors with respect to such patents unless Plaintiffs execute non-disclosure agreements that are designed to defeat Defendants' obligations to license these patents on fair, reasonable and non-discriminatory terms.

9. Defendants' obligation to license standard-essential patents on fair, reasonable and non-discriminatory terms further necessitates that Rockstar identify those patents within the portfolio that are subject to such obligations. Nevertheless, Rockstar has refused to provide such information to Plaintiffs.

10. Certain of the patents asserted by Rockstar are burdened with royalty-free licenses previously granted by Rockstar's predecessors-in-interest as part of agreements entered into with one or more Standard Setting Organizations ("SSOs"). Plaintiffs are implied licensees and third-party beneficiaries to such license(s). Moreover, Rockstar's right to sue Plaintiffs for infringement of these patents was exhausted once Plaintiffs purchased equipment and software embodying and/or used to practice the alleged inventions claimed in these patents by licensed vendors. Notwithstanding these facts, Rockstar, for itself and on behalf of Bockstar, Constellation, and Spherix, has wrongfully claimed Plaintiffs are practicing these patents without authority and Rockstar has improperly demanded that Plaintiffs negotiate a royalty-bearing license to these patents.

11. Through its communications and various enforcement activities, Rockstar has alleged that Plaintiffs and others in the communications, cable and/or wireline industries infringe a number of communications patents including U.S. Patents Nos. 5,471,474 (the "'474 patent"), 5,583,862 (the "'862 patent"), 5,761,197 (the "'197 patent"), 5,959,990 (the "'990

patent"), 6,128,649 (the "'649 patent"), 6,130,893 (the "'893 patent"), 6,192,397 (the "'397 patent"), 6,321,253 (the "'253 patent"), 6,845,389 (the "'389 patent"), 6,901,048 (the "'048 patent"), 7,154,879 (the "'879 patent"), 8,134,917 (the "'917 patent"), 8,464,299 (the "'299 patent"), and RE40,999 (the "'999 patent") and unspecified patents relating to communications and networking from among the more than 4,000 patents that form the portfolio (collectively, "the Rockstar Asserted Patents"). The Rockstar Asserted Patents are attached hereto as Exhibits A through N.

12. These activities by or on behalf of Defendants create an immediate, definite, concrete and substantial dispute regarding Plaintiffs' alleged infringement of patents in Rockstar's portfolio, including, but not limited to, those patents specifically identified above.

13. Rockstar has misused and attempted to obtain exorbitant royalties from licensing the patents it purchased from Nortel by: (a) refusing to identify to potential licensees the patents it seeks to enforce and instead broadly accusing companies of infringing the portfolio as a whole; (b) requiring all potential licensees to sign non-disclosure agreements as a precondition to negotiating licensing agreements for the purpose of obtaining royalties in excess of its FRAND obligations; (c) refusing to identify patents already licensed to vendors in an attempt to avoid exhaustion and extort multiple royalties; and (d) once requests are made to license standard essential patents, transferring those patents to third parties in an attempt to obtain increased royalties and avoid its FRAND licensing obligations.

14. In order to clear the cloud created by these threats, Plaintiffs bring this action for breach of contract as a result of Defendants' refusal to honor its FRAND licensing obligations, for various declaratory judgments by the Court, and for tortious interference and civil conspiracy.

## Parties

15.     Charter is a Delaware corporation with its principal place of business at 400 Atlantic Street, 10th Floor, Stamford, Connecticut 06901.  Charter is a provider of cable services in the United States, offering a variety of entertainment, information, and communications solutions to residential and commercial customers.

16.     WideOpenWest and Knology are Delaware corporations each having a principal place of business at 7887 E Belleview Ave., Suite 1000 Englewood, Colorado 80237.  WideOpenWest and Knology provide cable services in the United States, offering a variety of entertainment, information, and communications solutions to residential and commercial customers.

17.     Suddenlink is a Delaware limited liability company with its principal place of business at 520 Maryville Centre Drive, Suite 300, St. Louis, Missouri 63141.  Suddenlink provides cable services in the United States, offering a variety of entertainment, information, and communications solutions to residential and commercial customers.

18.     Cable One is a Delaware corporation with a principal place of business at 210 E. Earll Drive, Phoenix, Arizona 85012.  Cable One provides cable services in the United States, offering a variety of entertainment, information, and communications solutions to residential and commercial customers.

19.     Rockstar is a Delaware limited partnership.  On information and belief, Rockstar purports to have a principal place of business at 7160 North Dallas Parkway, Suite No. 250, Plano, Texas 75024.  Rockstar identifies itself as a "patent licensing company" that exists for the sole purpose of enforcing various patents in its portfolio.

20.     Constellation is a Delaware limited liability company that purports to have its principal place of business at Legacy Town Center 1, 7160 North Dallas Parkway, Suite No. 250, Plano, Texas 75024.  Constellation is a wholly owned subsidiary of Rockstar, and a patent assertion entity.

21.     Bockstar is a Delaware limited liability company that purports to have its principal place of business at Legacy Town Center 1, 7160 North Dallas Parkway Suite 250, Plano, Texas 75024.  Bockstar is a wholly owned subsidiary of Rockstar, and a patent assertion entity.

22.     Spherix is a Delaware company with its principal place of business located at 7927 Jones Branch Drive Suite 3125, Tysons Corner, Virginia 22102.  Spherix is, among other things, a patent assertion entity.

**Jurisdiction and Venue**

23.     This action arises under the Declaratory Judgment Act, 28 U.S.C. § 2201, and the patent laws of the United States, 35 U.S.C. § 1 *et seq*.

24.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1338(a), 1367, and 2201(a).

25.     This Court has personal jurisdiction over Defendants because each is a limited partnership, limited liability company or company residing in this District.

26.     Venue is proper in this District under 28 U.S.C. § 1391 because, among other reasons, Defendants reside and conduct business in this judicial district.

**Allegations Common to All Counts**

Technical Standards and the Process of Standard Adoption

27.      New communications technologies are only broadly commercialized after device manufacturers agree on specifications that allow for interconnectivity of the devices.  For cable, wireline, wireless, VoIP and other communications technologies alike (including but not limited to the delivery and routing of voice, data and video between providers for ultimate delivery to end user customers (hereinafter "communications technologies")), these technical specifications are usually developed through the efforts of Standard Setting Organizations ("SSOs") whose membership includes hardware manufacturers and service providers.

28.      The standards established by SSOs play a significant role in the development of communications technologies.  Standards facilitate adoption of new technologies and the development of interoperable hardware.   Standards allow consumers to purchase hardware from various manufacturers with confidence in its interoperability.

29.      Technologies incorporated into today's communications networks are based on standards established by recognized SSOs and adopted by key industry participants.

30.      To ensure that market participants are able to adopt and use established standards, SSOs promulgate policies and procedures that control the disclosure and licensing of patents held by participants that may read on adopted standards.  These policies and procedures are set out in each SSO's intellectual property rights policies ("IPR policies").

31.      Most, if not all, IPR policies typically require participants to disclose patents that relate to the standards being considered for adoption by the SSO.  These required disclosures allow the SSO and its members to evaluate technologies with full knowledge of the

various intellectual property rights that may affect the industry-wide cost of adopting that technology as part of a new standard.

32.   These disclosure obligations are vital to the standard setting process because they allow SSOs to develop standards without fear that patent owners participating in the standard setting process will aggressively enforce their patent rights against the industry once an infringing standard is adopted.

33.   IPR policies require participants that own standard essential patents to offer to license those patents on FRAND terms and, when necessary, on royalty-free terms.  IPR policies also require that licenses be made readily available to any member of the public interested in practicing the affected standards.

34.   IPR policies usually state that a participant's commitment to license its patents on FRAND terms is irrevocable and survives until the withdrawal of the standard for which the commitment was made.

35.   An example of an IPR policy promulgated by the IEEE can be found at: http://standards.ieee.org/develop/policies/bylaws/sect6-7.html#6

<u>Nortel's Participation in Standard Setting</u>

36.   Until its bankruptcy in 2009, Nortel Networks Corporation was a multinational communications and data networking equipment manufacturer.

37.   For over two decades, in conjunction with its research and development efforts, Nortel, its various subsidiaries, and acquired entities (collectively "Nortel") actively participated with SSOs to establish standards for communications technologies.

38.   Over the course of its business, Nortel participated in the development of standards promulgated by various SSOs including the Institute of Electrical and Electronics

Engineers ("IEEE"), the International Telecommunications Union ("ITU"), the Internet Engineering Task Force ("IETF"), and the 3rd Generation Partnership Project ("3GPP").

39.    During this same time period, Nortel obtained a large number of patents that cover various aspects of communications technologies.

40.    Certain patents issued to Nortel during this period arguably read on the standards developed through the IEEE, ITU, IETF, 3GPP and other SSOs.

41.    In accordance with the established policies of each SSO it participated with, Nortel openly and publicly committed itself to license any standard essential patents on FRAND terms. Nortel undertook these commitments through Letters of Assurance ("LOA") issued to the SSOs or simply by disclosing its patents pursuant to the IPR policies of each SSO.

42.    Many of the LOAs Nortel issued broadly stated that Nortel would provide FRAND licenses to any patents in its portfolio that read on a particular standard. An example of such a letter Nortel sent to the IETF is attached as Exhibit O.

43.    Other LOAs Nortel issued specified the individual patents within Nortel's portfolio that read on a particular standard. An example of this second type of letter is attached as Exhibit P.

44.    Nortel benefitted from having its technologies adopted by SSOs because they then would be included as core technologies in the communications industry and their use required by all manufacture and service providers.

45.    Nortel also acquired patents from other companies that arguably applied to these technical standards. On information and belief, these other companies also worked with such SSOs during standard setting processes and either executed LOAs or had a duty to disclose patents.

46.     These and other LOAs issued by Nortel represent binding commitments to license a segment of the Nortel patent portfolio on FRAND terms.

47.     Irrespective of whether Nortel (or the companies that developed patents Nortel acquired) issued an LOA, active participation with SSOs obligated the participant to offer each standard essential patent on FRAND terms.

### Nortel's Prior Royalty-Free License

48.     Data Over Cable Service Interface Specification ("DOCSIS") is a telecommunications standard created by Cable Television Laboratories, Inc. ("CableLabs") for providing high-speed data service over cable networks. CableLabs is a non-profit research and development consortium that is dedicated to pursuing new cable communications technologies and helping its cable operator members integrate those technical advancements into their business objectives.

49.     In 1998, CableLabs created a royalty-free cross-licensing patent pool for intellectual property rights essential to the DOCSIS specifications.

50.     Upon information and belief, when a company joins the DOCSIS patent pool, it grants a royalty-free license to CableLabs to all patents and other intellectual property owned then or thereafter by it or its affiliates, to the extent that practice of any CableLabs' specifications would infringe or otherwise utilize that property. The rights granted to CableLabs include the right under which CableLabs may sublicense its rights under those patents and other intellectual property.

51.     Upon information and belief, Nortel and/or its affiliates and predecessors joined the CableLabs DOCSIS patent pool and granted CableLabs a license (with the right to

sublicense others) to their patents and other intellectual property practiced through adherence to various the DOCSIS standards.

52. To the extent necessary to practice the DOCSIS standards, the '474, '197, '999 and '990 patents were among those as to which CableLabs was granted a royalty-free license with the right to sublicense others.

53. Upon information and belief, Rockstar acquired its patent portfolio, including the '474, '197, '999 and '990 patents, out of the bankruptcy estate created after Nortel filed for bankruptcy protection in Canada and the United States in 2009.

54. Upon information and belief, when Rockstar acquired its patent portfolio from the Nortel bankruptcy estate, Rockstar expressly agreed to honor Nortel's obligations to the DOCSIS patent pool.

55. Plaintiffs purchase DOCSIS capable hardware and software from various vendors.

56. Upon information and belief, CableLabs granted each of these vendors a sublicense to make, use, and sell the inventions claimed in the '474, '197, '999 and '990 patents, to the extent necessary to practice the DOCSIS standards.

57. Plaintiffs have purchased and use in providing their services licensed equipment sold to them by these vendors.

<u>Rockstar's Purchase of the Nortel Portfolio</u>

58. On January 14, 2009, Nortel filed a petition for bankruptcy protection and, thereafter, put its extensive patent portfolio up for auction.

59. A consortium consisting of Apple, Microsoft, Research in Motion, Sony and Ericsson formed a company named "Rockstar Bidco" to bid on the Nortel patent portfolio.

Rockstar Bidco ultimately prevailed at auction, purchasing Nortel's patent portfolio for approximately $4.5 Billion.

60.     Many of the patents that Rockstar Bidco obtained from Nortel have since been transferred to a second company named Rockstar Consortium US LP—one of the named defendants in this lawsuit.

61.     Rockstar Consortium has recently transferred some of these patents, including purportedly standard essential patents, to Bockstar, Constellation and Spherix and threatens to transfer more.

62.     On December 11, 2013, Constellation filed a patent infringement lawsuit against Time Warner Cable Inc. ("TWC") in the Eastern District of Texas, Case No. 2:13-cv-1079 (the "Texas Case").

63.     TWC is a cable provider in the United States that offers communications services similar to those that Plaintiffs offer to their customers.

64.     In the Texas Case, Constellation asserts that TWC infringes the '649, '389, '048, '879, '917, and '299 patents.

65.     In its meetings and correspondence with one or more Plaintiffs, Rockstar, for itself and on behalf of its wholly owned subsidiary Constellation, has specifically asserted that Plaintiffs are infringing the '879 patent.  Rockstar has also asserted to Plaintiffs that they are infringing numerous other unidentified patents in the portfolio relating to communications technologies.

66.     The technologies accused of infringement in the TWC lawsuit can be characterized as being directed to communications technologies similar to those employed in Plaintiffs' businesses.

67. Constellation's enforcement activities against TWC reflect a manifest intent, on the part of Constellation, to enforce its patent rights against the very communications technologies that are employed in Plaintiffs' businesses.

68. For these reasons, in addition to others alleged within this Complaint, Plaintiffs have a sufficient reasonable apprehension that they will face suit on these additional patents by Defendant(s) to support jurisdiction for the declaratory judgments sought in this Complaint with respect to those patents.

### Rockstar's Patent Enforcement Campaign Against Plaintiffs

69. Shortly after Rockstar took possession of the Nortel patent portfolio, Rockstar began a patent enforcement campaign by notifying Plaintiffs and others that they infringed large swaths of the patent portfolio now owned by Rockstar. Copies of the letters Rockstar sent to Plaintiffs are attached as Exhibits Q - U.

70. Rockstar asserted that its allegations of infringement were based on each Plaintiff's implementation of hardware and software that practices fundamental communications standards.

71. Rockstar stated in these letters that it "owns thousands of patents and patent applications in several different technology areas, most notably in communications and networking" and that each Plaintiff "currently offer[s] certain products and services that infringe patents owned by Rockstar."

72. While Rockstar's letters did accuse Plaintiffs of infringing specific patents within its portfolio, Rockstar was quick to explain that those named patents were provided by way of example, and that each Plaintiff should "*keep in mind that the [named] patents are part of a much larger portfolio.*"

13

73. Rockstar's letter writing campaign did not merely accuse each Plaintiff of infringing a handful of identified patents but, rather, accused each Plaintiff of infringing whole swaths of Rockstar's substantial patent portfolio.

74. After receiving Rockstar's letter, certain of the Plaintiffs opened a dialogue with Rockstar in an attempt to learn more about Rockstar's portfolio and, if necessary, to negotiate a license to aspects of Rockstar's portfolio.

75. Rockstar refused these overtures and demanded that each Plaintiff execute a non-disclosure agreement as a condition precedent to receiving information concerning the patents or discussing the terms of a license.

76. Restrictions demanded by Rockstar required that Plaintiffs agree to restrict disclosure of discussions with Rockstar. In certain instances, Rockstar demanded that one or more Plaintffs refrain from disclosing the substance of Rockstar's licensing negotiations to any third party for any purpose.

77. These restrictive non-disclosure agreements discouraged, and in some instances prohibited, Plaintiffs from discussing the terms of their licensing negotiations with other accused infringers or from notifying hardware suppliers of Rockstar's allegations for purposes of obtaining indemnification or to allow vendors to negotiate licenses directly.

78. In an effort to give due consideration to Rockstar's threats of patent litigation—or worse, serial enforcement of Rockstar's substantial portfolio—WOW, Suddenlink, Cable One and others executed Rockstar's mandatory non-disclosure agreement and entered into negotiations with Rockstar.

79. Other accused infringers, including Charter, declined to execute Rockstar's proposed agreement and were excluded from meaningful licensing negotiations. Charter was left with no other option but to sue or be sued.

80. For accused infringers that signed non-disclosure agreements it quickly became apparent that Rockstar had no intention of honoring its FRAND licensing obligations or negotiating a license to its portfolio in good faith.

81. During these negotiations, Rockstar used the size of its newly-acquired portfolio, coupled with the threat of serial litigation, to demand exorbitant licensing fees—fees that do not comport with the FRAND terms under which Rockstar was obligated to license the standard essential patents in its portfolio.

82. In addition to demanding exorbitant licensing fees, Rockstar also used the sheer size of its portfolio to preclude accused infringers from substantively evaluating the merits of Rockstar's infringement allegations.

83. Rockstar accomplished this by refusing to identify for accused infringers the full list of patents they were purportedly infringing. Instead, Rockstar provided only what it deemed "exemplary" patents from its portfolio for evaluation. This left accused infringers with no way to meaningfully evaluate Rockstar's infringement allegations, to refute its allegations of infringement, or to determine the actual value of the relevant patents within Rockstar's portfolio.

84. Relying on the substantial breadth of its portfolio, Rockstar also intimidated accused infringers by suggesting that failure to take a license to Rockstar's entire portfolio would place a cloud of uncertainty over their business and would, ultimately, result in those parties being subjected to an endless cycle of patent enforcement through serial litigation.

Rockstar's recent assignments of patents to Constellation and Bockstar, and sale of patents to Spherix with threats to sell more patents constitute actions in furtherance of these threats.

85.     Following up on its threats, since October 2013, Defendants have filed multiple lawsuits in which they accuse various technology companies of infringing patents within the portfolio. These recent enforcement activities by Defendants make the threat of serial litigation all the more concerning for Plaintiffs.

86.     Rockstar also used its non-disclosure agreements to preclude Plaintiffs from notifying their device manufacturers of the details of Rockstar's allegations of infringement—a necessary prerequisite to obtaining indemnification. This strategy interfered with Plaintiffs' contractual rights and increased Plaintiffs' potential liability. Rockstar used this strategy in an effort to coerce Plaintiffs, and others, to take a license to Rockstar's entire portfolio, including to patents not relevant to those parties' products and/or services, as well as to patents that were already licensed by Plaintiffs' vendor(s).

87.     By extinguishing communications between device manufacturers and service providers, Rockstar sought to increase its already exorbitant licensing fees—allowing it to sign up device manufacturers and service providers for separate licenses.

88.     Rockstar also used these restrictive non-disclosure agreements to extinguish communications between various participants in the communications industries. Rockstar's actions were intended to prevent Plaintiffs from ensuring that any license negotiated would be on fair, reasonable, and nondiscriminatory terms, facilitating Rockstar's efforts to extract fees in excess of those it was entitled to pursuant to its FRAND licensing obligations.

89.     Based on the foregoing, Rockstar required parties to execute non-disclosure agreements, not in a good-faith attempt to protect both parties during negotiation, but

rather, to erect an artifice that would allow Rockstar to conduct its improper licensing campaign in an environment that carried less risk of exposure to liability for violating its FRAND obligations.

90.     Using its inappropriate licensing strategy, Rockstar has refused to engage in good faith negotiation as required pursuant to its obligations to license its patents on FRAND terms.

Ownership of Rockstar Asserted Patents

91.     During the discussions set forth above, Rockstar represented that it was the owner and/or had the authority to negotiate licenses in connection with all of the patents in its portfolio.  Rockstar, to this day, continues to communicate with one or more of Plaintiffs in an effort to license the entire portfolio of patents.

92.     Bockstar and Constellation allege in recent pleadings filed in separate actions that they are now assignees of one or more of the patents that were originally included in the Rockstar portfolio.

93.     In a recent press release, Spherix also claims to be the assignee of a substantial number of patents that were originally part of the Rockstar portfolio.

94.     By engaging in negotiations to license not only its own patents but also those it has apparently assigned to other Defendants, Rockstar representatives were purporting to act not only on behalf of itself, but also on behalf of Constellation, Bockstar and Spherix.

95.     Upon information and belief, Rockstar currently owns all right, title, and interest in the '474, '862, '197, '990, '893, '397, '253, and '999 patents, and Constellation currently owns all right, title, and interest in the '649, '389, '048, '879, '917, and '299 patents.

## COUNT I – BREACH OF CONTRACT

96.     Plaintiffs reallege and incorporate by reference the allegations set forth in the other sections of this Complaint.

97.     Nortel entered into express or implied contractual commitments with various SSOs, including but not limited to, the IEEE to offer standard essential patents on FRAND terms.

98.     Nortel was contractually obligated to offer a license to its standard essential patents in a manner consistent with the representations contained in each LOA submitted to each SSO and in accordance with the IPR policies promulgated by each SSO.  This included an obligation to license standard essential patents on FRAND terms to members of the public, including the Plaintiffs' vendors, that would potentially implement the standards established by that SSO.

99.     Each SSO's IPR policy, as amended over time, constitutes a contractual commitment to offer standard essential patents in accordance with the terms of those policies. By participating with these SSOs, Nortel and other entities whose patents Nortel acquired promised to adhere to the policies and to offer standard essential patents on FRAND terms.

100.    As members of the public that would potentially implement the standards established by the IEEE, ITU, IETF, 3GPP and other SSOs, Plaintiffs and their vendors are intended third-party beneficiaries of Nortel's and other entities contractual commitments to those SSOs.

101.    As subsequent owners of the Nortel patent portfolio, Defendants are obligated to honor Nortel's express and implied FRAND licensing commitments with respect to the Nortel standard essential patents in their respective portfolios.

102. To the extent patents are standard essential, Rockstar and the remaining Defendants acting by or through Rockstar breached their express and implied FRAND licensing commitments—including its duty to satisfy its FRAND licensing commitments consistent with the covenant of good faith and fair dealing—by engaging in at least the following acts:

a. Making or having made public statements to the effect that Nortel's FRAND licensing commitments would not be honored;

b. Refusing to offer to license standard essential patents to Plaintiffs or their vendors on FRAND terms;

c. Refusing to enter into licensing negotiations with Plaintiffs or their vendors in the absence of highly-restrictive non-disclosure agreements;

d. Requiring Plaintiffs and third-parties, including Plaintiffs' vendors, to execute non-disclosure agreements intended to achieve licenses having non-uniform terms and obligations;

e. Refusing to enter into licensing negotiations in the absence of non-disclosure agreements that precluded Plaintiffs from communicating with device manufacturers regarding their allegations of infringement;

f. Using the protections afforded it under non-disclosure agreements to conduct its campaign to extort industry participants, including Plaintiffs, that have adopted well-established digital telecommunication standards; and

g. Refusing to make the terms of existing license agreements and commitments publicly available or to offer such arrangements to all industry participants on nondiscriminatory terms and conditions.

103. Through the foregoing acts, Defendants breached the express and implied FRAND licensing commitments Nortel and other entities made to each SSO.

104. As a result of the foregoing breaches, Plaintiffs have been injured in their business or property, and are threatened by imminent loss of profits, loss of customers, and loss of goodwill.

## COUNT II – DECLARATORY JUDGMENT
## OF OBLIGATION TO LICENSE ON FRAND TERMS

105. Plaintiffs reallege and incorporate by reference the allegations set forth in the other sections of this Complaint.

106. Nortel expressly or impliedly entered into contractual commitments with the IEEE, IETF, ITU, 3GPP, and other SSOs to offer to license standard essential patents in a manner consistent with the representations in each LOA and pursuant to the policies promulgated by each SSO.

107. As subsequent owners to the Nortel patent portfolio, Defendants are obligated to honor Nortel's express and implied FRAND licensing commitments with respect to at least those patents.

108. Rockstar, for itself and on behalf of its assignees Constellation, Bockstar and Spherix, has publicly repudiated its duty to honor Nortel's express and implied FRAND licensing commitments with respect to any and all standard essential patents that were previously part of the Nortel patent portfolio.

109. Rockstar, for itself and on behalf of its assignees Constellation, Bockstar and Spherix, has refused to offer licenses to Plaintiffs or their vendors on FRAND terms for FRAND-encumbered standard essential patents.

110.    There is a dispute between the parties concerning whether Defendants are obligated to offer to license to Plaintiffs or their vendors on FRAND terms standard essential patents that were previously part of the Nortel patent portfolio.

111.    The dispute is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

112.    Plaintiffs are entitled to a declaratory judgment that Defendants have not offered licenses to Plaintiffs or their vendors on terms consistent with the representations in each LOA submitted by Nortel and pursuant to the policies promulgated by the IEEE, IETF, ITU, 3GPP and other SSOs.

113.    Because Defendants have refused to offer licenses to Plaintiffs or their vendors on FRAND terms, Plaintiffs are further entitled to a declaratory judgment setting forth the FRAND terms for each valid, standard essential, FRAND encumbered patent practiced by Plaintiffs and not already licensed by Plaintiffs' vendors.

114.    Plaintiffs are further entitled to a declaratory judgment that if Defendants refuse to offer licenses to the foregoing patents to Plaintiffs or their vendors on FRAND terms, the standard essential patents at issue shall be unenforceable as to Plaintiffs.

COUNT III – DECLARATORY JUDGMENT OF PARTIES' RESPECTIVE RIGHTS
REGARDING ASSERTED COMMUNICATIONS TECHNOLOGY PORTFOLIO

115.    Plaintiffs reallege and incorporate by reference the allegations set forth in the other sections of this Complaint.

116.    Rockstar, for itself and on behalf of its assignees Constellation, Bockstar and Spherix, has accused Plaintiffs of infringing the communications technology patents in the portfolio.

117.    Despite these public allegations of infringement, Rockstar, for itself and for its assignees, has refused to identify the entire list of patents within its portfolio that it accuses Plaintiffs of infringing.

118.    Rockstar's refusal to identify the entire list of patents that form the basis for the infringement allegations leave Plaintiffs with no way to meaningfully assess the merits of Rockstar's allegations.

119.    The pall Rockstar's allegations place over Plaintiffs' businesses leave Plaintiffs in the untenable position of incurring a growing potential liability for patent infringement or placing their business enterprise at risk.

120.    At least because of Rockstar's allegations of infringement, and in light of its related patent enforcement behavior as described above, a substantial, immediate, and real controversy exists between Rockstar and Plaintiffs regarding whether any Plaintiff infringes the communications technology patents in Rockstar's patent portfolio.

121.    For the reasons stated above, a judicial declaration is necessary to determine the parties' respective rights regarding Rockstar's allegations that Plaintiffs infringe Rockstar's portfolio of communications patents.

## COUNT IV – DECLARATORY JUDGMENT OF
## LICENSE AND EXHAUSTION OF PATENT RIGHTS

122.    Plaintiffs reallege and incorporate by reference the allegations set forth in the other sections of this Complaint.

123.    An actual controversy exists between Plaintiffs and Rockstar as to whether Plaintiffs are beneficiaries of a royalty-free license under at least the '474, '197, '999 and '990 patents, among potentially other Rockstar Asserted Patents.

124.    The issue of whether Plaintiffs are beneficiaries of a royalty-free license under at least the '474, '197, '999, and '990 patents is ripe for adjudication because Rockstar has insisted that Plaintiffs infringe the '474, '197, '999 and '990 patents by practicing one or more DOCSIS standards published by CableLabs, and has demanded that Plaintiffs pay a royalty for a license to the '474, '197, '990 and '999 patents.

125.    A judicial declaration is necessary and appropriate to decide whether Plaintiffs are beneficiaries of a royalty-free license under at least the '474, '197, '999 and '990 patents.

126.    To the extent Rockstar's allegations of infringement are predicated on the alleged making, use, sale, offer for sale, or importation of vendor products, such allegations against Plaintiffs are barred pursuant to the licenses that its vendors hold to at least the '474, '197, '999 and '990 patents based on an express or implied license and/or the doctrine of patent exhaustion.

127.    In light of Rockstar's allegations of infringement, an actual and justiciable controversy exists between Plaintiffs and Rockstar with respect to whether Rockstar's patent rights in the '474, '197, '999 and '990 patents are expressly or impliedly licensed to Plaintiffs and/or exhausted.

128.    Absent a declaration that Rockstar's rights in the '474, '197, '999 and '990 patents are expressly or impliedly licensed to Plaintiffs and/or exhausted, Rockstar will continue to wrongfully assert the '474, '197, '999 and '990 patents against Plaintiffs and thereby cause Plaintiffs irreparable harm and injury.

129.    Based on the foregoing, Plaintiffs hereby request a declaration from the Court that Rockstar's rights in at least the '474, '197, '999 and '990 patents are expressly or

impliedly licensed to Plaintiffs and/or exhausted with respect to Plaintiffs' use of vendor products or services.

COUNT V – DECLARATORY JUDGMENT OF<br>NON-INFRINGEMENT OF THE '474 PATENT

130.    Plaintiffs reallege and incorporate by reference the allegations set forth in the other sections of this Complaint.

131.    At least because of Rockstar's patent enforcement behavior described above, a substantial, immediate, and real controversy exists regarding whether Plaintiffs infringe the '474 patent.

132.    The issue of whether Plaintiffs infringe any claims of the '474 patent is ripe for adjudication because Rockstar, on behalf of itself or any subsequent owner of the '474 patent, has insisted that Plaintiffs infringe the '474 patent and has demanded that each pay for a license to the '474 patent.

133.    The issue of whether Plaintiffs infringe any claims of the '474 patent is also ripe for adjudication because Rockstar, on behalf of itself or any subsequent owner of the '474 patent, has generally asserted that Plaintiffs infringe upon communications patents within the portfolio and have taken steps that give rise to a reasonable apprehension that Plaintiffs will be sued for infringement of the '474 patent.

134.    In light of the foregoing, a judicial declaration is necessary and appropriate so that Plaintiffs may ascertain their rights as to whether they infringe the '474 patent.

135.    Alternatively, Plaintiffs do not infringe the '474 patent directly, contributorily, or by inducement because Plaintiffs do not practice any of the claims of the '474 patent.

136.    Plaintiffs request that the Court enter a declaratory judgment that Plaintiffs have not and do not infringe any claim of the '474 patent.

## COUNT VI – DECLARATORY JUDGMENT OF
## NON-INFRINGEMENT OF THE '862 PATENT

137.    Plaintiffs reallege and incorporate by reference the allegations set forth in the other sections of this Complaint.

138.    At least because of Rockstar's patent enforcement behavior described above, a substantial, immediate, and real controversy exists regarding whether Plaintiffs infringe the '862 patent.

139.    The issue of whether Plaintiffs infringe any claims of the '862 patent is ripe for adjudication because Rockstar, on behalf of itself or any subsequent owner of the '862 patent, has insisted that Charter infringes the '862 patent and has demanded that they pay for a license to the '862 patent.

140.    The issue of whether Plaintiffs infringe any claims of the '862 patent is also ripe for adjudication because Rockstar, on behalf of itself or any subsequent owner of the '862 patent, has generally asserted that Plaintiffs infringe upon communications patents within the portfolio and have taken steps that give rise to a reasonable apprehension that Plaintiffs will be sued for infringement of the '862 patent.

141.    In light of the foregoing, a judicial declaration is necessary and appropriate so that Plaintiffs may ascertain their rights as to whether they infringe the '862 patent.

142.    Alternatively, Plaintiffs do not infringe the '862 patent directly, contributorily, or by inducement because Plaintiffs do not practice any of the claims of the '862 patent.

143.    Plaintiffs request that the Court enter a declaratory judgment that Plaintiffs have not and do not infringe any claim of the '862 patent.

### COUNT VII – DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE '197 PATENT

144.    Plaintiffs reallege and incorporate by reference the allegations set forth in the other sections of this Complaint.

145.    At least because of Rockstar's patent enforcement behavior described above, a substantial, immediate, and real controversy exists regarding whether Plaintiffs infringe the '197 patent.

146.    The issue of whether Plaintiffs infringe any claims of the '197 patent is ripe for adjudication because Rockstar, on behalf of itself or any subsequent owner of the '197 patent, has insisted that Plaintiffs infringe the '197 patent and has demanded that each pay for a license to the '197 patent.

147.    The issue of whether Plaintiffs infringe any claims of the '197 patent is also ripe for adjudication because Rockstar, on behalf of itself or any subsequent owner of the '197 patent, has generally asserted that Plaintiffs infringe upon communications patents within the portfolio and have taken steps that give rise to a reasonable apprehension that Plaintiffs will be sued for infringement of the '197 patent.

148.    In light of the foregoing, a judicial declaration is necessary and appropriate so that Plaintiffs may ascertain their rights as to whether they infringe the '197 patent.

149.    Alternatively, Plaintiffs do not infringe the '197 patent directly, contributorily, or by inducement because Plaintiffs do not practice any of the claims of the '197 patent.

150.     Plaintiffs request that the Court enter a declaratory judgment that Plaintiffs have not and do not infringe any claim of the '197 patent.

COUNT VIII – DECLARATORY JUDGMENT OF
NON-INFRINGEMENT OF THE '649 PATENT

151.     Plaintiffs reallege and incorporate by reference the allegations set forth in the other sections of this Complaint.

152.     At least because of Rockstar's patent enforcement behavior described above, a substantial, immediate, and real controversy exists regarding whether Plaintiffs infringe the '649 patent.

153.     The issue of whether Plaintiffs infringe any claims of the '649 patent is ripe for adjudication because Rockstar, on behalf of itself or any subsequent owner of the '649 patent, has generally asserted that Plaintiffs infringe upon communications patents within the portfolio and have taken steps that give rise to a reasonable apprehension that Plaintiffs will be sued for infringement of the '649 patent.

154.     In light of the foregoing, a judicial declaration is necessary and appropriate so that Plaintiffs may ascertain their rights as to whether they infringe the '649 patent.

155.     Alternatively, Plaintiffs do not infringe the '649 patent directly, contributorily, or by inducement because Plaintiffs do not practice any of the claims of the '649 patent.

156.     Plaintiffs request that the Court enter a declaratory judgment that Plaintiffs have not and do not infringe any claim of the '649 patent.

## COUNT IX – DECLARATORY JUDGMENT OF
## NON-INFRINGEMENT OF THE '893 PATENT

157.    Plaintiffs reallege and incorporate by reference the allegations set forth in the other sections of this Complaint.

158.    At least because of Rockstar's patent enforcement behavior described above, a substantial, immediate, and real controversy exists regarding whether Plaintiffs infringe the '893 patent.

159.    The issue of whether Plaintiffs infringe any claims of the '893 patent is ripe for adjudication because Rockstar, on behalf of itself or any subsequent owner of the '893 patent, has insisted that Charter and WOW infringe the '893 patent and has demanded that each pay for a license to the '893 patent.

160.    The issue of whether Plaintiffs infringe any claims of the '893 patent is also ripe for adjudication because Rockstar, on behalf of itself or any subsequent owner of the '893 patent, has generally asserted that Plaintiffs infringe upon communications patents within the portfolio and have taken steps that give rise to a reasonable apprehension that Plaintiffs will be sued for infringement of the '893 patent.

161.    In light of the foregoing, a judicial declaration is necessary and appropriate so that Plaintiffs may ascertain their rights as to whether they infringe the '893 patent.

162.    Alternatively, Plaintiffs do not infringe the '893 patent directly, contributorily, or by inducement because Plaintiffs do not practice any of the claims of the '893 patent.

163.    Plaintiffs request that the Court enter a declaratory judgment that Plaintiffs have not and do not infringe any claim of the '893 patent.

## COUNT X – DECLARATORY JUDGMENT OF
## NON-INFRINGEMENT OF THE '397 PATENT

164.     Plaintiffs reallege and incorporate by reference the allegations set forth in the other sections of this Complaint.

165.     At least because of Rockstar's patent enforcement behavior described above, a substantial, immediate, and real controversy exists regarding whether Plaintiffs infringe the '397 patent.

166.     The issue of whether Plaintiffs infringe any claims of the '397 patent is ripe for adjudication because Rockstar, on behalf of itself or any subsequent owner of the '397 patent, has insisted that Charter infringes the '397 patent and has demanded that it pay for a license to the '397 patent.

167.     The issue of whether Plaintiffs infringe any claims of the '397 patent is also ripe for adjudication because Rockstar, on behalf of itself or any subsequent owner of the '397 patent, has generally asserted that Plaintiffs infringe upon communications patents within the portfolio and have taken steps that give rise to a reasonable apprehension that Plaintiffs will be sued for infringement of the '397 patent.

168.     In light of the foregoing, a judicial declaration is necessary and appropriate so that Plaintiffs may ascertain their rights as to whether they infringe the '397 patent.

169.     Alternatively, Plaintiffs do not infringe the '397 patent directly, contributorily, or by inducement because Plaintiffs do not practice any of the claims of the '397 patent.

170.     Plaintiffs request that the Court enter a declaratory judgment that Plaintiffs have not and do not infringe any claim of the '397 patent.

COUNT XI – DECLARATORY JUDGMENT OF
NON-INFRINGEMENT OF THE '253 PATENT

171.    Plaintiffs reallege and incorporate by reference the allegations set forth in the other sections of this Complaint.

172.    At least because of Rockstar's patent enforcement behavior described above, a substantial, immediate, and real controversy exists regarding whether Plaintiffs infringe the '253 patent.

173.    The issue of whether Plaintiffs infringe any claims of the '253 patent is ripe for adjudication because Rockstar, on behalf of itself or any subsequent owner of the '253 patent, has insisted that Charter and WOW infringe the '253 patent and has demanded that each pay for a license to the '253 patent.

174.    The issue of whether Plaintiffs infringe any claims of the '253 patent is also ripe for adjudication because Rockstar, on behalf of itself or any subsequent owner of the '253 patent, has generally asserted that Plaintiffs infringe upon communications patents within the portfolio and have taken steps that give rise to a reasonable apprehension that Plaintiffs will be sued for infringement of the '253 patent.

175.    In light of the foregoing, a judicial declaration is necessary and appropriate so that Plaintiffs may ascertain their rights as to whether they infringe the '253 patent.

176.    Alternatively, Plaintiffs do not infringe the '253 patent directly, contributorily, or by inducement because Plaintiffs do not practice any of the claims of the '253 patent.

177.    Plaintiffs request that the Court enter a declaratory judgment that Plaintiffs have not and do not infringe any claim of the '253 patent.

## COUNT XII – DECLARATORY JUDGMENT OF
## NON-INFRINGEMENT OF THE '389 PATENT

178.    Plaintiffs reallege and incorporate by reference the allegations set forth in the other sections of this Complaint.

179.    At least because of Rockstar's patent enforcement behavior described above, a substantial, immediate, and real controversy exists regarding whether Plaintiffs infringe the '389 patent.

180.    The issue of whether Plaintiffs infringe any claims of the '389 patent is ripe for adjudication because Rockstar, on behalf of itself or any subsequent owner of the '389 patent, has generally asserted that Plaintiffs infringe upon communications patents within the portfolio and have taken steps that give rise to a reasonable apprehension that Plaintiffs will be sued for infringement of the '389 patent.

181.    In light of the foregoing, a judicial declaration is necessary and appropriate so that Plaintiffs may ascertain their rights as to whether they infringe the '389 patent.

182.    Alternatively, Plaintiffs do not infringe the '389 patent directly, contributorily, or by inducement because Plaintiffs do not practice any of the claims of the '389 patent.

183.    Plaintiffs request that the Court enter a declaratory judgment that Plaintiffs have not and do not infringe any claim of the '389 patent.

## COUNT XIII – DECLARATORY JUDGMENT OF
## NON-INFRINGEMENT OF THE '048 PATENT

184.    Plaintiffs reallege and incorporate by reference the allegations set forth in the other sections of this Complaint.

185.    At least because of Rockstar's patent enforcement behavior described above, a substantial, immediate, and real controversy exists regarding whether Plaintiffs infringe the '048 patent.

186.    The issue of whether Plaintiffs infringe any claims of the '048 patent is ripe for adjudication because Rockstar, on behalf of itself or any subsequent owner of the '048 patent, has generally asserted that Plaintiffs infringe upon communications patents within the portfolio and have taken steps that give rise to a reasonable apprehension that Plaintiffs will be sued for infringement of the '048 patent.

187.    In light of the foregoing, a judicial declaration is necessary and appropriate so that Plaintiffs may ascertain their rights as to whether they infringe the '048 patent.

188.    Alternatively, Plaintiffs do not infringe the '048 patent directly, contributorily, or by inducement because Plaintiffs do not practice any of the claims of the '048 patent.

189.    Plaintiffs request that the Court enter a declaratory judgment that Plaintiffs have not and do not infringe any claim of the '048 patent.

## COUNT XIV – DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE '879 PATENT

190.    Plaintiffs reallege and incorporate by reference the allegations set forth in the other sections of this Complaint.

191.    At least because of Rockstar's patent enforcement behavior described above, a substantial, immediate, and real controversy exists regarding whether Plaintiffs infringe the '879 patent.

192.    The issue of whether Plaintiffs infringe any claims of the '879 patent is ripe for adjudication because Rockstar, on behalf of itself or any subsequent owner of the '879 patent, has insisted that Charter infringes the '879 patent and has demanded that it pay for a license to the '879 patent.

193.    The issue of whether Plaintiffs infringe any claims of the '879 patent is also ripe for adjudication because Rockstar, on behalf of itself or any subsequent owner of the '879 patent, has generally asserted that Plaintiffs infringe upon communications patents within the portfolio and have taken steps that give rise to a reasonable apprehension that Plaintiffs will be sued for infringement of the '879 patent.

194.    In light of the foregoing, a judicial declaration is necessary and appropriate so that Plaintiffs may ascertain their rights as to whether they infringe the '879 patent.

195.    Alternatively, Plaintiffs do not infringe the '879 patent directly, contributorily, or by inducement because Plaintiffs do not practice any of the claims of the '879 patent.

196.    Plaintiffs request that the Court enter a declaratory judgment that Plaintiffs have not and do not infringe any claim of the '879 patent.

COUNT XV – DECLARATORY JUDGMENT OF
NON-INFRINGEMENT OF THE '917 PATENT

197.    Plaintiffs reallege and incorporate by reference the allegations set forth in the other sections of this Complaint.

198.    At least because of Rockstar's patent enforcement behavior described above, a substantial, immediate, and real controversy exists regarding whether Plaintiffs infringe the '917 patent.

199.    The issue of whether Plaintiffs infringe any claims of the '917 patent is ripe for adjudication because Rockstar, on behalf of itself or any subsequent owner of the '917 patent, has generally asserted that Plaintiffs infringe upon communications patents within the portfolio and have taken steps that give rise to a reasonable apprehension that Plaintiffs will be sued for infringement of the '917 patent.

200.    In light of the foregoing, a judicial declaration is necessary and appropriate so that Plaintiffs may ascertain their rights as to whether they infringe the '917 patent.

201.    Alternatively, Plaintiffs do not infringe the '917 patent directly, contributorily, or by inducement because Plaintiffs do not practice any of the claims of the '917 patent.

202.    Plaintiffs request that the Court enter a declaratory judgment that Plaintiffs have not and do not infringe any claim of the '917 patent.

COUNT XVI – DECLARATORY JUDGMENT OF
NON-INFRINGEMENT OF THE '299 PATENT

203.    Plaintiffs reallege and incorporate by reference the allegations set forth in the other sections of this Complaint.

204.    At least because of Rockstar's patent enforcement behavior described above, a substantial, immediate, and real controversy exists regarding whether Plaintiffs infringe the '299 patent.

205.    The issue of whether Plaintiffs infringe any claims of the '299 patent is ripe for adjudication because Rockstar, on behalf of itself or any subsequent owner of the '299 patent, has generally asserted that Plaintiffs infringe upon communications patents within the

portfolio and have taken steps that give rise to a reasonable apprehension that Plaintiffs will be sued for infringement of the '299 patent.

206.    In light of the foregoing, a judicial declaration is necessary and appropriate so that Plaintiffs may ascertain their rights as to whether they infringe the '299 patent.

207.    Alternatively, Plaintiffs do not infringe the '299 patent directly, contributorily, or by inducement because Plaintiffs do not practice any of the claims of the '299 patent.

208.    Plaintiffs request that the Court enter a declaratory judgment that Plaintiffs have not and do not infringe any claim of the '299 patent.

COUNT XVII – CIVIL CONSPIRACY
(Against All Defendants)

209.    Plaintiffs reallege and incorporate by reference the allegations set forth in the other sections of this Complaint.

210.    On information and belief, Defendants Rockstar, Constellation, Bockstar and Spherix have entered into agreements in which they sought to avoid Rockstar's legal obligation to make available licenses to the patents in the portfolio on fair, reasonable and non-discriminatory terms.

211.    In furtherance of this agreement, despite an obligation to make licenses available to Plaintiffs on fair, reasonable and non-discriminatory terms, Rockstar instead purportedly assigned to Constellation through written agreement its interest to U.S. Patent Nos. 6,128,649 (the "'649 Patent"), 6,845,389 (the "'389 Patent"), 6,901,048 (the "'048 Patent"), 7,154,879 (the "'879 Patent"), 8,134,917 (the "'917 Patent") and 8,464,299 (the "'299 Patent").

All of these patents were previously owned by Nortel and acquired by Rockstar as part of the bankruptcy liquidation.

212.    In furtherance of this agreement, despite an obligation to make licenses available to Plaintiffs on fair, reasonable and non-discriminatory terms, Rockstar instead purportedly assigned to Bockstar through written agreement its interest to U.S. Patent Nos. 6,233,245 (the "'245 patent"), 6,684,241 (the "'241 patent"), 6,069,895 (the "'895 patent"), 5,732,080 (the "'080 patent"), 6,636,508 (the "'508 patent"), and 6,778,653 (the "'653 patent"). All of these patents were previously owned by Nortel and acquired by Rockstar as part of the bankruptcy liquidation.

213.    On information and belief, Rockstar previously accused at least one Plaintiff of infringing some of the patents it assigned to these subsidiaries. In addition, Rockstar has accused other communications providers of infringing some of these patents.

214.    On information and belief, Rockstar transferred these patents to Bockstar and Constellation in an effort to avoid Rockstar's FRAND obligations. As such, Bockstar, Constellation and Rockstar are all acting outside of the scope of their normal course of business and for personal gain to which they are not entitled.

215.    On information and belief, Rockstar is obligated to license these patents on FRAND terms.

216.    According to press reports, Rockstar is also actively working with Spherix "to assist in the effective commercialization of the over 4,000 patents owned by Rockstar."

217.    According to those reports, Rockstar plans to sell a large portion of its patent portfolio and to "*hold on to a few of the key patents, specifically the ones involved in lawsuits against Google and other companies.*" These same press reports explain that Rockstar

has already sold several patents "*to Spherix Inc. as part of a deal that would include Rockstar sharing in any future financial profits based on the patents*" and that "*Rockstar is also sharing usage information with Spherix for the transferred patents, and will assist Spherix in working with the patents' inventors, to assist Spherix's commercialization efforts.*"

218. In furtherance of this alleged agreement, despite an obligation to make licenses available to Plaintiffs on fair, reasonable and non-discriminatory terms, Rockstar instead purportedly sold U.S. Patent Nos. 5,581,599; 5,752,195; 5,892,814; 6,614,899; and 6,965,614, among others, to Spherix.

219. On information and belief, Rockstar is obligated to license some or all of the patents it transferred to Spherix on FRAND terms.

220. On information and belief, Rockstar's sale of these patents to Spherix is subject to a written agreement.

221. The plan to sell off purportedly standard essential patents to other entities with an active plan to maintain a portion of the revenue stream—whether through a subsidiary or through written agreement—constitutes an active agreement to seek royalty rates in excess of FRAND in violation of law. Likewise, a plan to sell standard essential patents to other entities with an active plan for them to seek royalty rates above FRAND rates also constitutes an active agreement to seek royalty rates in excess of FRAND in violation of law.

222. These agreements tortiously interfere with Rockstar's contractual obligations and caused Rockstar to breach its contract to provide standard essential patents on FRAND terms.

223. These agreements also further Rockstar's scheme to distort the competitive marketplace through unfair competition.

224. The mere fact that the patents have been assigned or sold constitutes an unlawful act in furtherance of the unlawful agreement.

225. Bockstar and Constellation have also filed lawsuits in furtherance of the conspiracy.

226. To the extent Rockstar follows through on its threats to sell off additional standard essential patents to other entities, such sales will be additional acts in furtherance of the conspiracy with yet to be named co-conspirators and in furtherance of Bockstar, Constellation and Spherix's tortious interference with contracts to which Plaintiffs are third-party beneficiaries.

227. As a direct, proximate, and foreseeable result of the Defendants' conspiracy, Plaintiffs have suffered and face the threat of economic injury, including as a result of their inability to obtain licenses to purportedly standard essential patents on FRAND terms, the uncertainty in their business operations associated with the Defendants' allegations of infringement of standard essential patents, the corresponding diminished value of their business operations, increased costs, lower quality or innovation in communications technology, loss of profits, loss of customers and potential customers, loss of goodwill, and uncertainty among customers and potential customers.

228. As a direct, proximate, and foreseeable result of Defendants' conspiracy, competition has been injured in the market for products and services purportedly covered by Defendants' communications patents, causing and threatening to cause injury to consumers, including decreases in innovation and quality competition for products and services purportedly covered by Defendants' communications standard essential patents as well as the inevitable passing on to consumers of improper royalties demanded by Rockstar.

## COUNT XVIII – TORTIOUS INTERFERENCE WITH CONTRACT
(Against Constellation, Bockstar and Spherix)

229. Plaintiffs reallege and incorporate by reference the allegations set forth in the other sections of this Complaint.

230. As more fully alleged above, Rockstar, as a successor-in-interest to the Nortel patent portfolio, is obligated to offer to license FRAND-encumbered standard essential patents consistent with Nortel's express or implied contractual commitments with various SSOs. This includes an obligation to license standard essential patents on FRAND terms to members of the public, including Plaintiffs and Plaintiffs' vendors, that would potentially implement the standards established by the various SSOs—making Plaintiffs and Plaintiffs' vendors intended third-party beneficiaries of Nortel's and other entities' contractual commitments to those SSOs.

231. On information and belief, Constellation, Bockstar and Spherix knew at all relevant times of Rockstar's contractual obligation to offer to license these standard essential patents on FRAND terms.

232. Constellation entered into written agreements with Rockstar to obtain by assignment purportedly standard essential patents that Rockstar was obligated to offer to license to Plaintiffs and their vendors on FRAND terms including, to the extent essential to the practice of any such standard, the '649 Patent, the '389 Patent, the '048 Patent, the '879 Patent, the '917 Patent, and the '299 Patent.

233. Bockstar entered into written agreements with Rockstar to obtain by assignment purportedly standard essential patents that Rockstar was obligated to offer to license to Plaintiffs and their vendors on FRAND terms including, to the extent essential to the practice of any such standard, the '245 patent, the '241 patent, the '895 patent, the '080 patent, the '508 patent, and the '653 patent.

234.   Spherix entered into written agreements with Rockstar to obtain by assignment purportedly standard essential patents that Rockstar was obligated to offer to license to Plaintiffs and their vendors on FRAND terms including, to the extent essential to the practice of any such standard, U.S. Patent Nos. 5,581,599; 5,752,195; 5,892,814; 6,614,899; and 6,965,614.

235.   Spherix has also entered into written agreements with Rockstar to obtain by assignment over one hundred additional patents from the Rockstar portfolio, many of which, on information and belief, are standard essential patents.

236.   Press releases from Spherix and Rockstar regarding this sale indicated that the patents Rockstar transferred to Spherix "cover the way traffic, video and voice are carried over public and private networks" and include "industry standard patents."

237.   Constellation and Bockstar intentionally entered into these written agreements with Rockstar.

238.   On information and belief, there are additional parties to which Rockstar has assigned FRAND-encumbered purportedly standard essential patents that were previously part of the Nortel patent portfolio and to which Plaintiffs and their vendors are entitled to obtain a license on FRAND terms.

239.   Constellation's, Bockstar's, and Spherix's conduct in entering into these written agreements were significant factors in causing Rockstar to breach its contractual obligation to license any such standard essential patents to Plaintiffs and/or their vendors on FRAND terms.

240.   On information and belief, Constellation, Bockstar and Spherix took these assignments in bad faith to assist Rockstar in avoiding its FRAND licensing obligations to

Plaintiffs and their vendors in violation of the law. Further, on information and belief, Constellation, Bockstar and Spherix took these assignments not in pursuit of any good faith, legitimate profit-seeking activity, but instead in order to enable themselves to seek royalty rates for these patents in excess of FRAND in violation of law. As such, Constellation, Bockstar and Spherix lacked justification for entering into these agreements with Rockstar.

241. As a direct, proximate, and foreseeable result of these actions by Constellation and Bockstar, Plaintiffs have suffered and face the threat of economic injury, including as a result of their inability to obtain licenses to standard essential patents on FRAND terms, the uncertainty in their business operations associated with Defendants' allegations of infringement of purportedly standard essential patents, the corresponding diminished value of their business operations, increased costs, lower quality or innovation in communications technology, loss of profits, loss of customers and potential customers, loss of goodwill, and uncertainty among customers and potential customers.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request the Court to enter judgment for them and against Rockstar as follows:

A. Finding that Rockstar is liable to Plaintiffs for breach of contract;

B. Declaring Rockstar's licensing obligations with respect to its FRAND-encumbered communications patents and the corresponding unenforceability of those patents if not offered for license on FRAND terms;

C. Ordering Rockstar to specifically perform its contractual obligations by offering a FRAND license to Plaintiffs and/or their vendors to each valid FRAND-encumbered patent in its portfolio that is practiced by Plaintiffs;

D.      Declaring that Plaintiffs do not infringe the communications patents for which Rockstar has alleged infringement but which Rockstar has refused to specifically identify;

E.      Declaring that Rockstar's allegations of infringement of the '474, '197, '990 and '999 patents through the use, sale or offer to sell vendor products and services practicing DOCSIS are barred by license and/or patent exhaustion;

F.      Declaring that Plaintiffs do not directly or indirectly infringe the '474 patent;

G.      Declaring that Plaintiffs do not directly or indirectly infringe the '862 patent;

H.      Declaring that Plaintiffs do not directly or indirectly infringe the '197 patent;

I.      Declaring that Plaintiffs do not directly or indirectly infringe the '649 patent;

J.      Declaring that Plaintiffs do not directly or indirectly infringe the '893 patent;

K.      Declaring that Plaintiffs do not directly or indirectly infringe the '397 patent;

L.      Declaring that Plaintiffs do not directly or indirectly infringe the '253 patent;

M.      Declaring that Plaintiffs do not directly or indirectly infringe the '389 patent;

N.      Declaring that Plaintiffs do not directly or indirectly infringe the '048 patent;

O.     Declaring that Plaintiffs do not directly or indirectly infringe the '879 patent;

P.     Declaring that Plaintiffs do not directly or indirectly infringe the '917 patent;

Q.     Declaring that Plaintiffs do not directly or indirectly infringe the '299 patent;

R.     Finding that Rockstar, Bockstar, Constellation and Spherix have misused their patents and have waived and are estopped from enforcing them in the marketplace.

S.     Finding that Rockstar, Bockstar, Constellation and Spherix are liable to Plaintiffs for entering into an illegal conspiracy, and assessing corresponding damages;

T.     Finding Bockstar and Constellation liable to Plaintiffs for tortiously interfering with one or more contracts to which Plaintiffs are third-party beneficiaries;

U.     Awarding Plaintiffs direct and consequential damages caused by Rockstar's breach of contract, including attorneys' fees, in an amount to be proven at trial;

V.     Awarding Plaintiffs their costs and attorneys' fees pursuant to Rule 54(d) of the Federal Rules of Civil Procedure or other applicable authority; and

W.     Awarding Plaintiffs such other and further relief as the Court deems just and proper.

## JURY DEMAND

Under Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury for all claims so triable.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Rodger D. Smith II*

Rodger D. Smith II (#3778)
Jeremy A. Tigan (#5239)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
rsmith@mnat.com
jtigan@mnat.com

*Attorneys for Plaintiffs*

OF COUNSEL:

Thomas L. Duston
Kevin D. Hogg
John R. Labbé
MARSHALL, GERSTEIN BORUN LLP
233 South Wacker Drive
6300 Willis Tower
Chicago, IL 60606-6357
(312) 474-6300
*Attorneys for Charter Communications, Inc.*

William Ray Price, Jr.
Jennifer E. Hoekel
Richard L. Brophy
Mark L. Thomas
ARMSTRONG TEASDALE LLP
7700 Forsyth Blvd., Suite 1800
St. Louis, MO 63105
(314) 621-5070
*Attorneys for WideOpenWest Finance LLC
a/k/a WOW! Internet, Cable & Phone,
Knology, Inc. and Cequel Communications,
LLC d/b/a Suddenlink Communications*

Charles W. Steese
IJay Palansky
STEESE, EVANS & FRANKEL, P.C.
6400 South Fiddlers Green Circle, Suite 1820
Denver, CO 8011
(720) 200-0676
*Attorneys for WideOpenWest Finance LLC
a/k/a WOW! Internet, Cable & Phone and
Knology, Inc.*

January 16, 2014
7930447.1